NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-1179                                          Appeals Court

JAMIE CIAMPA, individually and as administratrix,[1]  vs.  BANK OF AMERICA[2] & another.[3]


No. 14-P-1179.

Essex.     June 3, 2015. - August 13, 2015.

Present:  Meade, Hanlon, & Blake, JJ.


Individual Retirement Account.  Mistake.  Trust, Beneficiary, Mistake.


Complaint for instructions filed in the Essex Division of the Probate and Family Court Department on May 5, 2010.

The case was heard by Susan D. Ricci, J.


W. Matthew Iler, Jr., for the plaintiff.
Robert A. Delle for J. Edward Cotgageorge.


MEADE, J.  This case requires us to review the propriety of

the allocation of a sixty-six percent share of an individual

retirement account (IRA) of the decedent, Priscilla Cotgageorge

_____

[1] Of the estate of Priscilla Cotgageorge.

[2] Doing business as Merrill Lynch Wealth Management.

[3] J. Edward Cotgageorge.

(Priscilla).  Following her death, that share was to be paid to a named contingent beneficiary whose identity cannot be ascertained.  Both Priscilla's daughter, the plaintiff Jamie Ciampa (Jamie), and her stepson, the defendant J. Edward Cotgageorge (Edward), claim to be that contingent beneficiary and, consequently, to be entitled to that share.  After a trial, a judge of the Probate and Family Court awarded the sixty-six percent share, as well as the other thirty-four percent share, to Edward.  Jamie appeals, and we vacate the decree.

1.  Background.  We summarize the facts found by the judge, supplementing with uncontroverted evidence in the record. Yankee Microwave, Inc. v. Petricca Communications Sys., Inc., 53 Mass. App. Ct. 497, 499 (2002).  Priscilla died intestate in 2007; her husband, James Cotgageorge (James), had predeceased her.  Priscilla and James had two children during their marriage:  a daughter, Jamie, who enjoyed a close relationship with Priscilla, and a son, Michael.[4]  Edward was Priscilla's stepson, and except for a few short visits and a summer spent living with her and James in Marblehead, Edward lived across the country and was generally uninvolved in the family affairs.

At the time of her death, Priscilla owned an IRA held by the defendant Bank of America, doing business as Merrill Lynch

---

[4] Michael is not a party to this action.

Wealth Management (Merrill).[5]  Priscilla opened the account in November, 1997, by signing an IRA agreement form and funding the account.  The parties stipulated that while Priscilla had signed the form, the handwriting on the rest of the form was not hers. The form named her husband, James, as the sole primary beneficiary,[6] and named two people as contingent beneficiaries: "James Cotgageorge, Jr." was to receive a sixty-six percent share, and "J. Edward Cotyup" was to receive the other thirty-four percent share.  Each was identified as Priscilla's "son," but no Social Security number or date of birth was entered for either of them.  In addition, Priscilla's Social Security number was incorrectly recorded on the form.  The parties stipulated that "J. Edward Cotyup" was a reference to Edward.  No person with the name "James Cotgageorge, Jr." exists in either Priscilla's or James's families.

In October, 2009, two years after Priscilla's death, Merrill notified Edward that he was entitled to both shares of the IRA and that it intended to pay him the full account

---

[5] The decedent and Jamie had another IRA as joint tenants; that IRA is not the subject of this dispute.

[6] Because James predeceased Priscilla, the contingent beneficiaries are entitled to the value of the IRA.

balance.[7]  Jamie, as administratrix of Priscilla's estate, then sought to prevent Merrill from distributing the sixty-six percent share to Edward, claiming in a letter that she believed that share "must be made payable to the estate of [Priscilla]." In December, Merrill agreed to refrain from distributing the IRA pending the filing of a complaint for instructions and a subsequent court order.  Merrill took no position on the question of who was entitled to the share, stating only that it would pay it to whomever the court determined was the proper beneficiary.  Subsequently, on May 5, 2010, Jamie filed a complaint for instructions in the Probate and Family Court. While Jamie initially asked for a declaratory judgment that Merrill pay the share into Priscilla's estate, she subsequently abandoned that strategy, intervened in her individual capacity, and sought payment of the share directly to herself instead of to her mother's estate.

The parties agreed that Edward was entitled to the thirty-four percent share; however, Jamie and Edward each testified at trial to his or her belief that he or she was the person incorrectly recorded as "James, Jr."  Following trial, the judge found that Jamie had not proved that the IRA agreement form did not reflect Priscilla's intent.  The judge found "no evidence to

---

[7] Edward testified at trial that he only learned of the IRA's existence when he received this correspondence from Merrill.  Prior to that, he had no knowledge of the account.

prove that the beneficiaries on the form were not as [Priscilla] intended or that [Priscilla] intended to distribute any of the IRA to [Jamie]." She concluded that Priscilla -- a legal secretary and the wife of a local attorney -- knew how to designate or change beneficiaries to her IRA, and would have done so if that had been her intent. The judge ordered payment of the contested sixty-six percent share to Edward.

2. Discussion. The judge held that Jamie failed to establish that a mistake was made in the formation of the IRA. We review the propriety of that decision. More specifically, we must determine whether the IRA agreement form contains a mistake due to a scrivener's error and, if it does, whether we can reform the IRA agreement form to conform to Priscilla's intent. In so doing, we review the judge's factual findings for clear error, giving deference to her assessment of witness credibility. We will, however, review her conclusions of law de novo. See, e.g., Martin v. Simmons Properties, LLC, 467 Mass. 1, 8 (2014).

Our resolution of this case turns on an application of trust law.[8] See 26 U.S.C. § 408 (2012) (defining an IRA as "a

---

[8] Jamie appeals on a related but somewhat different theory of a mutual mistake made at the time of contract formation and seeks to reform the instrument on that basis. "The doctrine of reformation for mistake with regard to trusts differs from that with respect to instruments such as contracts . . . .

trust created or organized in the United States for the exclusive benefit of an individual or [her] beneficiaries").[9] See Restatement (Third) of Trusts § 25 comment c(3) (2001). "In order for a trust to be valid in the Commonwealth, it must unequivocally show an intention that the legal estate be vested in one person to be held in some manner or for some purpose on behalf of another." Ventura v. Ventura, 407 Mass. 724, 726 (1990) (citation omitted). A drafting error may be grounds to reform the trust instrument "once the existence of a mistake is established by full, clear, and decisive proof." Bellemare v. Clermont, 69 Mass. App. Ct. 566, 572 (2007) (citation omitted). "Included in the category of unilateral mistakes for which relief may be obtained is a settlor's acceptance of a trust instrument which, because of the mistake or inadvertence of the scrivener, fails to embody the settlor's intentions." Berman v. Sandler, 379 Mass. 506, 510 (1980). Finally "[t]he interpretation of a written trust is a matter of law to be resolved by the court. A trust should be construed to give effect to the intention of the settlor as ascertained from the

_____

[M]utuality of mistake is not always required where trusts are concerned." Berman v. Sandler, 379 Mass. 506, 509-510 (1980).

   [9] During the life of the settlor, an IRA is essentially a revocable, inter vivos trust, and the settlor may name or remove beneficiaries at any time until death. Following death, the trust becomes irrevocable.

language of the whole instrument considered in the light of the attendant circumstances.  We are in as good a position as the [trial] judge to do this."  Redstone v. O'Connor, 70 Mass. App. Ct. 493, 499 (2007) (citations omitted).

Here, the parties agree that the thirty-four percent share belongs to Edward.  The sole issue is to whom Priscilla (or the scrivener) intended to refer by naming "James, Jr.," a person who does not exist, as a contingent beneficiary.

a.  Scrivener's error.  Jamie claims that the misnomer of "James, Jr." constitutes a scrivener's error on the IRA agreement form.  We agree.  The judge found that "James, Jr." does not exist in the Cotgageorge family.[10]  Designating a person who does not exist as the intended beneficiary of a trust is, without more, "clear and decisive proof of mistake due to scrivener's error."  Pond v. Pond, 424 Mass. 894, 898 (1997).  Despite this, the judge nevertheless concluded that "[Priscilla] signed the form and sent funds to open the account making her intentions clear" (emphasis supplied).  The judge's findings of fact do not support this conclusion.  The mere fact that Priscilla opened and funded an IRA does not mean that her intended beneficiaries were correctly recorded on the form,

---

[10] This finding is not clearly erroneous, and is supported by the testimony of both Edward and Jamie, as well as Edward's certificate of live birth, which was introduced in evidence.

particularly where it was uncontroverted that the form had been filled out by a third party, not Priscilla.[11]  The misnomer is therefore attributable to the "mistake or inadvertence of the scrivener, [which] fails to embody the settlor's intentions." Berman v. Sandler, 379 Mass. at 510.  The judge erred in concluding otherwise.

b.  Reformation.  Having proven a scrivener's error, Jamie next seeks the reformation of the IRA agreement form to reflect her asserted right to the sixty-six percent share, while Edward defends the judge's decree awarding the entire account to him. The Supreme Judicial Court has "allowed the reformation of an ambiguous trust instrument based on extrinsic evidence of the settlor's intent and provisions in the instrument that showed that the [scrivener] who drafted it failed to carry out the settlor's intent."  Putnam v. Putnam, 425 Mass. 770, 772 (1997). As discussed above, Jamie proved that the scrivener failed to name the sixty-six percent beneficiary in accordance with

---

[11] Edward testified to his belief that Priscilla had deliberately named him as "James, Jr." on the IRA agreement form, because his father and Priscilla had used the nicknames "Jimmy" or "Junior" to refer to him in childhood.  Thus, Edward characterized the reference to him as "James, Jr." as a "tongue-in-cheek . . . joke" which was a secret among him, James, and Priscilla.  The judge imputed significant legal acumen to Priscilla as a secretary to her late husband (an attorney); even if this finding is left undisturbed, it cuts against Edward, not in his favor.  An experienced legal secretary would not have made a reference to a joke on an important legal document.

Priscilla's intent.  Jamie goes further, however, and claims

that "James, Jr." is an obvious reference to her.  We disagree.

Jamie's claim that she is "James, Jr." is primarily based

on the similarity of her first name to James, and her

explanation of the word "son" and "Junior."[12]  She also points to

the close familial relationship she enjoyed with her mother, as

well as the fact that her late father had distributed sixty-six

percent of his estate to her and thirty-four percent to Edward -

- the same proportion she now suggests Priscilla intended for

her IRA.  The judge, however, rejected this explanation as

merely "possible [but] not plausible," noting "it is not

probable that [Priscilla] would misspell her daughter's name,

call her daughter 'Jr.'" and list her daughter as her son."

When we compare Jamie's offer to other cases, the party seeking

reformation in those cases presented much more.  See, e.g.,

DiCarlo v. Mazzarella, 430 Mass. 248, 250 (1999) (trust language

indicated settlor's intent to qualify for marital deduction);

Grassian v. Grassian, 445 Mass. 1012, 1014 (2005) (trust

language and drafting attorney's affidavit stated settlor's

intent to minimize tax liability); Ryan v. Ryan, 447 Mass. 1003

(2006) (record contained affidavits of settlors stating their

intent).  The judge found that Jamie's explanation was based on

---

[12] Jamie testified to her belief that a Merrill employee had erroneously filled out the signed form on Priscilla's behalf.

speculation and also, we presume, considered her credibility as a witness; we see no reason to disturb that finding on appeal. See Kendall v. Selvaggio, 413 Mass. 619, 625 (1992). Therefore, Jamie has not clearly and decisively proven that she was the intended beneficiary of the share held for "James, Jr."

Our inquiry is not at an end. We must address the judge's decision to award the sixty-six percent share to Edward. Even viewing the evidence in the light most favorable to him, see Foster v. Group Health Inc., 444 Mass. 668, 672 (2005), the evidence does not support the decree. The award to Edward rests primarily on the judge's determination that Jamie is not "James, Jr.," in addition to the facts that Priscilla had legal experience, signed the IRA agreement, could have changed the beneficiary at any time, and funded the account.[13] None of those facts suggest the conclusion that Edward is entitled to the entire account. Indeed, we see no basis for the judge to have concluded that the "two gifts were designated and intended to be to the same beneficiary," i.e., Edward. Rather, where two beneficiaries are designated, each taking a share of a trust, the settlor logically intended to make two separate gifts, not

---

[13] Edward's testimony that he expected to receive "something" from Priscilla's estate is satisfied by his receipt of the thirty-four percent share. In addition, the judge declined to explicitly credit his self-serving testimony concerning a secret childhood nickname about which only he, Priscilla, and James knew. See note 10, supra.

one.  See DiCarlo v. Mazzarella, 430 Mass. at 250 (settlor's intent based on "the trust instrument as a whole and the circumstances known to the settlor on execution" [citation omitted]).  "While intent is the lodestar of testamentary construction, it cannot be used . . . to supply a missing clause or to permit speculation as to what the testatrix might have intended . . . ."  Redstone v. O'Connor, 70 Mass. App. Ct. at 501 (citation omitted).  With respect to the factual findings in Edward's favor, we are therefore "left with the definite and firm conviction that a mistake has been committed."  Woodward Sch. for Girls, Inc. v. Quincy, 469 Mass. 151, 159 (2014) (citation omitted).  See Director of Div. of Employment Sec. v. Mattapoisett, 392 Mass. 858, 862 n.5 (1984); Kendall v. Selvaggio, 413 Mass. at 625.

On the record before us, where neither Jamie nor Edward has established a viable claim to the share held for the benefit of "James, Jr.," we are unable to reform the instrument.  If the intended beneficiary of all or part of an express trust is unascertainable, that portion of the trust fails, and a resulting trust arises in favor of the settlor or her estate if she has died.  See 6 Scott & Ascher, Trusts, § 41.13 at 2883 & n. 1 (5th ed. 2009).  That is the result we reach here.[14]  See

---

[14] We decline to order a new trial because neither party has requested that relief, and there is no suggestion that either

Ventura v. Ventura, 407 Mass. at 730.  See Stanwood v. Stanwood, 179 Mass. 223, 226-227 (1901) (where trust fails as to one of multiple intended beneficiaries, resulting trust arises regarding failed beneficiary's pro rata share).

Accordingly, the decree is vacated.  A new decree shall enter as follows:  the sixty-six percent share held for the benefit of "James, Jr." will be held in a resulting trust for the benefit of Priscilla's estate.[15]  The thirty-four percent share held for the benefit of Edward will be paid to him, without interest.[16]

So ordered.

---

Jamie or Edward was denied the opportunity to present all of his or her evidence at trial.

[15] Because Priscilla died without a valid will, the share must be distributed in accordance with the provisions of G. L. c. 190B, § 2-103.  See Woodbury v. Hayden, 211 Mass. 202, 206 (1912) ("The trust having ended, whatever remains of the trust fund should be disposed of as intestate property").

[16] Interest should not have been awarded on any portion of the IRA.  See O'Shea v. Barry, 252 Mass. 510, 511 (1925) ("An executor or administrator is not chargeable with interest on the money of the estate in his hands, unless he has received interest thereon or put it to some profitable use or unreasonably detained it").  Jamie has not unreasonably detained any of the proceeds of the estate where she sought to release Edward's thirty-four percent share and properly filed a complaint seeking instructions as to the disposition of the sixty-six percent share.