NEYMAN, J.
*144 In this appeal, we are asked to review a decree issued by a judge of the Probate and Family Court terminating a nominee trust under the Massachusetts Uniform Trust Code (MUTC), G. L. c. 203E. We conclude that termination was warranted pursuant to § 412 (a ) of the MUTC, and thus affirm.
Background. The present case involved six vacant lots located "adjacent to and between" two summer cottages on Martha's Vineyard. For many decades, the cottages and the lots were owned by, or held in trust for the benefit of, members of the MacMackin family, including Alice MacMackin (Alice) and her husband Stuart *145 MacMackin (Stuart). Alice and Stuart had two daughters, Cynthia[1] and Janet. Cynthia married Ivo Meisner (Ivo) in 1967 and they had two sons, Eerik and Ian (collectively, the Meisners). Cynthia and Ivo divorced in 2006. Janet married James Wansack and they had three children, Andrew, Heather, and Karen (collectively, the Wansacks). *3 While Alice and Stuart were alive, the cottages and lots were used as a family compound.[2] Stuart died in 1983, and Alice died in 2009.
Following Alice's death, disputes arose between the Meisners and the Wansacks over the vacant lots and two cottages. In 2015, the sides resolved the quarrel over the two cottages by a settlement agreement, through which Janet purchased the Meisners' interest in both cottages. However, the dispute over the vacant lots, which were held in the nominee trust discussed infra, lingered and triggered the present litigation. We begin with a brief overview of the legal instruments related to the disposition of the vacant lots.
1. Stuart's will and testamentary trust. Under the terms of his will, Stuart established a testamentary trust and devised to this trust the cottages and vacant lots. His will expressed his "wish if practicable that these summer homes and lots be kept undivided in the family and used as they are now for as long as that is possible and practicable." His will further expressed his desire, "if that be practicable under the circumstances," that, upon the death of Cynthia and Janet, the testamentary trust continue and the cottages and lots be maintained for the benefit of his grandchildren.[3] Despite these provisions, the parties did not dispute that upon Stuart's death in 1983, the vacant lots passed directly to Alice and were not governed by the provisions of Stuart's will or *146 testamentary trust.[4] The cottages, however, remained in the testamentary trust until Janet purchased the Meisners' interest in both cottages in 2015.
2. MacMackin Nominee Realty Trust. On December 23, 1994, Alice and Ivo,[5] as trustees, created the MacMackin Nominee Realty Trust[6] (MacMackin trust),[7] to which Alice transferred the vacant lots.[8] The vacant lots were the only assets of the MacMackin trust, which was never otherwise *4 funded, apart from a nominal ten dollars.
The MacMackin trust provided that the trustees held any trust property for the sole benefit of the beneficiaries and acted only as directed by all of the beneficiaries. The trust further provided that it may be terminated at any time by agreement of all of the beneficiaries but, in any event, shall terminate twenty years after the death of Alice or Ivo, whichever is later. The operative schedule of beneficiaries specified that the Wansacks together held fifty percent of the beneficial interest, while Cynthia's two sons and Ivo held the other fifty percent.[9] Janet and Cynthia paid the taxes on the vacant lots until 2001, thereafter Stuart's testamentary trust paid the taxes through 2013, and Cynthia and Janet subsequently shared the tax payments until the summer of 2015. The judge found that the combined yearly real estate taxes for the vacant lots was $ 6,447.
3. Petition to terminate the MacMackin trust. As discussed supra, Janet purchased the Meisners' interest in the two cottages, at which time they were deeded to Janet and the testamentary trust *147 was terminated.[10] However, the Wansacks and Meisners wrangled over the appropriate disposition of the vacant lots held in the MacMackin trust. Their ongoing dispute led to the present litigation. Specifically, Ivo, in his capacity as trustee and beneficiary of the MacMackin trust, and with the assent of his sons, filed a petition in the Probate and Family Court to terminate the trust. The petition alleged that termination was proper under G. L. c. 203E, §§ 411, 412, and 414. In an attachment to the petition, Ivo asserted that the MacMackin trust "no longer serves any useful purpose, ... lacks any financial assets to meet the requirements of administration, ... [and] should be dissolved and the ownership thereof converted to tenancies in common, in the respective percentages of the beneficiaries." The Wansacks opposed the termination of the trust and any sale or development of the vacant lots.
After a trial, the judge issued written findings in which he concluded that Alice and Stuart wanted to create a place for family gatherings, but that Alice, the settlor of the MacMackin trust, did not anticipate one daughter's family "buying out" the other daughter's family interest in both cottages "for a significant purchase price." The judge further found that, upon the "sale of the cottages to Janet Wansack, the Meisners no longer have cause or desire to vest any funds into the preservation of the vacant lots (i.e., payment of real estate taxes) and therefore, the [MacMackin trust] would be rendered unproductive and uneconomical." Citing to §§ 411 and 412 of the MUTC, the judge determined that "[t]he material purpose for which the [MacMackin trust] was created, to facilitate a family compound, is no longer viable and therefore, continuation of the [MacMackin trust] is not necessary to achieve any material purpose of the [MacMackin trust]."[11] Through an amended decree, the *5 judge ordered termination of the MacMackin trust and distribution of the three lots closest to the cottages *148 to the Wansacks and the other three lots to the Meisners, according to their beneficial interests. The judge also awarded $ 21,385.28 in legal fees and costs to Ivo pursuant to G. L. c. 215, § 45, noting that he, the judge, had taken into consideration the written settlement offer extended by Ivo before trial. The Wansacks have appealed from the amended decree.
Discussion. The Wansacks contend on appeal that the judge erred in terminating the MacMackin trust because (1) Stuart and Alice did in fact anticipate one daughter's family purchasing the other daughter's family interest in the cottages, and (2) Stuart and Alice intended to conserve the lots in their natural state. They maintain that the vacant lots were always intended to protect the privacy and enjoyment of the cottages, preserving privacy is a material purpose of the MacMackin trust, termination would violate the purpose of the trust and flout Alice's and Stuart's intent on maintaining a family compound, and thus the MacMackin trust should continue pursuant to its terms.
The Meisners respond that (1) the evidence at trial showed that Alice only intended that both families share equal ownership in the cottages and vacant lots, and (2) there was no conservation purpose to the MacMackin trust. They further contend that now that the Wansacks own both cottages, the vacant lots provide no benefit to the Meisners, and continuation of the MacMackin trust would be impracticable or wasteful as it no longer serves any useful purpose. We agree with the position articulated by the Meisners, and hold that the judge properly terminated the MacMackin trust under G. L. c. 203E, § 412 (a ).
1. Termination of the MacMackin trust. a. Applicability of the MUTC. In determining whether the judge properly terminated the MacMackin trust, we first look to the plain language of the trust instrument. See Ferri v. Powell-Ferri, 476 Mass. 651, 654, 72 N.E.3d 541 (2017). As discussed infra, the MacMackin trust provides that it may be terminated (1) by agreement of all of the beneficiaries, or (2) twenty years after the later of the death of Alice or Ivo. Neither condition for termination had been met when Ivo filed his petition to terminate the trust.
Having determined that the MacMackin trust could not be terminated pursuant to its own terms, we next consider whether there was another legal basis for termination. This requires us to consider whether the MUTC applies to the present case. For the reasons delineated below, we conclude that it does.
First, both parties conducted their analysis under the MUTC, and neither disputes its applicability to the MacMackin trust. Indeed, *149 the Wansacks contend that, as "it is undisputed that the [MacMackin] trust was created by Alice MacMackin for donative purposes, chapter 203E appears to govern its administration." We agree.
The MUTC, effective July 8, 2012, provides distinct statutory bases for termination of trusts in certain circumstances. See G. L. c. 203E, §§ 410 - 412, 414. Although the MUTC states the general rule that the terms of a trust prevail over any provision of the MUTC, a specific exception to that rule is "the power of the court to modify or terminate a trust under sections 410 to 416, inclusive."
*6 G. L. c. 203E, § 105 (b ) (4). Pursuant to its enabling legislation, "[e]xcept as otherwise provided in this act," the MUTC's provisions "shall apply to all trusts created before, on or after the effective date of this act." St. 2012, c. 140, § 66 (a ) (1). Furthermore, the MUTC provides, in relevant part, that "[t]his chapter applies to express trusts, charitable or non-charitable, of a donative nature." G. L. c. 203E, § 102. See Passero v. Fitzsimmons, 92 Mass. App. Ct. 76, 79-81, 81 N.E.3d 814 (2017) (MUTC governed dispute over administration of revocable trust).
The parties do not dispute that the MacMackin trust, created by Alice and Ivo, is an express trust. See Restatement (Second) of Trusts § 2 & comment a (1959) ("A trust ... is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.... The term 'express trust' is used to indicate a trust as here defined whenever it is desirable to emphasize the contrast between a trust as here defined on the one hand and a resulting trust or a constructive trust on the other hand"); Black's Law Dictionary 1650 (9th ed. 2009) (defining "express trust" as "A trust created with the settlor's express intent, [usually] declared in writing"). See also Amory v. Trustees of Amherst College, 229 Mass. 374, 385-386, 118 N.E. 933 (1918) (contrasting express trust with implied or constructive trust created by operation of law). See generally H.J. Alperin, Summary of Basic Law § 17:4 (5th ed. 2018) (describing types of trusts, including express, implied, resulting, and constructive).
Furthermore, there is no dispute that the MacMackin trust was *150 of a donative nature.[12] See Restatement (Second) of Property: Donative Transfers, Division III Introductory Note, v. 4 at 3 (1992) ("The underlying requirement to effectuate a donative transfer is the intention on the part of the donor that some interest in property of the donor move from the donor to the intended donee, either during the donor's lifetime or on the donor's death"); Maloney & Rounds, The Massachusetts Uniform Trust Code: Context, Content, and Critique, 96 Mass. L. Rev. 27, 41 (2014) ("A nominee trust may or may not be covered [by the MUTC], depending upon whether the shares of beneficial interests are created incident to a donative transfer"). Accordingly, we hold that the MUTC applies to the present case and we interpret the termination of the MacMackin trust thereunder.[13]
b. Legal standards for trust interpretation. We review the legal standards for trust interpretation as they are key to our resolution of the issue before us. Pursuant to § 412 (a ) of the MUTC, a court may terminate a trust "if, because of circumstances not anticipated by the settlor ... termination will further the purposes of the trust." Determination of the purposes of the trust hinges "on what the intent of the trust instrument was, for that intention 'is the "controlling consideration" in determining the rights' of the parties under the trust."
*7 Steele v. Kelley, 46 Mass. App. Ct. 712, 732, 710 N.E.2d 973 (1999), quoting Dumaine v. Dumaine, 301 Mass. 214, 218, 16 N.E.2d 625 (1938).
"[T]he interpretation of a written trust is a matter of law to be resolved by the court." Ciampa v. Bank of Am., 88 Mass. App. Ct. 28, 31, 35 N.E.3d 765 (2015), quoting Redstone v. O'Connor, 70 Mass. App. Ct. 493, 499, 874 N.E.2d 1118 (2007). "[W]hen interpreting trust language, ... we do not read words in isolation and out of context. Rather we strive to discern the settlor's intent from the trust instrument as a whole and from the circumstances known to the settlor at the time the instrument was executed." Ferri, 476 Mass. at 654, 72 N.E.3d 541, quoting Hillman v. Hillman, 433 Mass. 590, 593, 744 N.E.2d 1078 (2001). Indeed, the MUTC defines "[t]erms of a trust" as "the manifestation of the settlor's intent regarding a trust's provisions as expressed in the trust instrument *151 or as may be established by other evidence that would be admissible in a judicial proceeding." G. L. c. 203E, § 103.
We are in as good a position as the trial judge to interpret the trust to give effect to the intention of the settlor "as ascertained from the language of the whole instrument considered in the light of the attendant circumstances." Ciampa, 88 Mass. App. Ct. at 31, 35 N.E.3d 765, quoting Redstone, 70 Mass. App. Ct. at 499, 874 N.E.2d 1118. "We do, of course, defer to a trial judge's findings of fact where he has had the opportunity to observe and evaluate witnesses," unless the findings are clearly erroneous. General Dynamics Corp. v. Assessors of Quincy, 388 Mass. 24, 29, 444 N.E.2d 1266 (1983). See Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996).
Of further note, at trial in the present case both parties relied, in part, on extrinsic evidence to demonstrate Alice's intent in forming the MacMackin trust. See Redstone, 70 Mass. App. Ct. at 501, 874 N.E.2d 1118. Neither party contends on appeal that extrinsic evidence was inadmissible, and neither party contends that the language of the MacMackin trust was free from ambiguity as applied to the subject matter of this case. See Ferri, 476 Mass. at 654, 72 N.E.3d 541 ("[E]xtrinsic evidence may be admitted when a contract is ambiguous on its face or as applied to the subject matter" [citation omitted] ). With these principles in mind, we look to the purposes of the MacMackin trust.
c. Purposes of the MacMackin trust. Relying on the terms of Stuart's testamentary trust, the terms of the MacMackin trust, the historical use of the cottages and vacant lots, and testimony that Alice shared her husband's wishes for the cottages, the judge concluded that the material purpose of the MacMackin trust was to facilitate a family compound. He further concluded that, upon Janet's purchase of the Meisners' interest in the cottages, the family compound concept -- intended to encompass both the Meisners and Wansacks -- was no longer viable and, therefore, continuation of the MacMackin trust was not necessary to achieve any material purpose of that trust. Finally, the judge found that upon Janet's purchase, "the Wansack family obtained sole use and occupancy of not only the cottages but also, inadvertently, use and occupancy of the adjacent vacant lots.... These facts alone create a set of circumstances which the Court finds that [Alice] did not anticipate."
Stuart's will indeed states his "wish" that the testamentary trust continue, "if that [is] practicable under the circumstances," to support an ongoing family compound. However, it is the MacMackin *152 trust that we interpret in this case, not Stuart's will. See *8 Hillman, 433 Mass. at 593, 744 N.E.2d 1078 ("we strive to discern the settlor's intent from the trust instrument as a whole and from the circumstances known to the settlor at the time the instrument was executed"). Even so, we discern no error in the judge's determination that a material[14] purpose of the MacMackin trust was to facilitate a family compound. The evidence adduced at trial to identify the purposes of the trust, which was credited by the judge, supported his conclusion that Alice shared her husband's desires vis-à-vis the property. The evidence also supported the judge's determination that the goal of facilitating a family compound is no longer practicable.
Our analysis does not end there. The facilitation of a family compound was not the only purpose of the trust. As provided in the instrument itself, the identified purposes of the MacMackin trust included that it qualify as a nominee trust for Federal and State income tax purposes, and that it hold the legal title to the trust estate for the benefit of the beneficiaries. Also, the trial evidence showed that a purpose of the trust was to achieve estate planning objectives by removing the vacant lots from Alice's estate. These purposes have been achieved.
Moreover, through the express terms of the trust instrument, Alice ensured that each daughter's family held fifty percent of the beneficial interest in the MacMackin trust, and thus, fifty percent of the interest in the properties held by the MacMackin trust during its term and upon its termination. This equal split of the beneficial interest evinces Alice's intention of treating her daughters equally. As noted supra, the MacMackin trust required unanimous consent of "all" the beneficiaries prior to the trustees taking any action. These requirements limited the possibility of one family controlling the MacMackin trust. Thus, in view of the terms of the instrument and all of the surrounding circumstances, a critical purpose of the MacMackin trust was for each family to have equal *153 use, enjoyment, and control of the properties. See Redstone, 70 Mass. App. Ct. at 499, 874 N.E.2d 1118, quoting Schroeder v. Danielson, 37 Mass. App. Ct. 450, 453, 640 N.E.2d 495 (1994) (appellate court is in as good position as trial judge to interpret trust to give effect to intention of settlor "as ascertained from the language of the whole instrument considered in the light of the attendant circumstances").
d. Termination under § 412 (a) of MUTC. With the above-referenced purposes of the MacMackin trust in mind, we return to the provisions pertaining to the termination of trusts in the MUTC. Under G. L. c. 203E, § 412 (a ), "[t]he court may ... terminate the trust if, because of circumstances not anticipated by the settlor, ... termination will further the purposes of the trust." Although we agree with the Wansacks that Alice, like her husband, may have anticipated that one of the families might, by agreement, purchase the other family's interest in the vacant lots, there is nothing in the record to suggest that Alice anticipated that one family would buy the cottages but not the vacant lots. We discern no error, therefore, in the judge's conclusion that unanticipated circumstances eliminated the Meisner family's *9 ability to enjoy the benefits of the trust property. Continuing the MacMackin trust to allow the Wansacks to enjoy the privacy provided by the vacant lots, while the Meisners enjoy no benefits from the vacant lots, would contravene Alice's intention that the two families have equal control and enjoyment of the trust property. By contrast, termination of the MacMackin trust and distribution of the assets to the beneficiaries at this time, when the Meisners no longer have any interest in the cottages and derive no benefit from the vacant lots, furthers the remaining purpose of the trust that is capable of being achieved -- equal treatment of the families of Alice's two daughters. The requirements for termination under § 412 (a ) were met. Otherwise said, "because of circumstances not anticipated by [Alice], ... termination will further the purposes of the trust." G. L. c. 203E, § 412 (a ). Thus, termination pursuant to § 412 (a ) was warranted.[15]
2. Conservation claim. The Wansacks raise the separate argument that the judge erred in failing to find that Stuart and Alice *154 intended to conserve the vacant lots in their natural state. We disagree. In January of 1994, Alice wrote a letter to Janet stating that she, Alice, was considering several options in regard to the vacant lots. They included (1) doing nothing and keeping the lots in her estate, (2) making an outright gift to Cynthia and Janet allowing them to choose whether to keep the lots, gift them to conservation, or some combination of those two choices, or (3) putting them all "into conservation." The undisputed evidence at trial revealed that Alice chose to give two lots to the Vineyard Open Land Foundation, a Massachusetts charitable trust. See note 8, supra. She also chose to create the MacMackin trust to hold the other vacant lots for her daughters and their families such that each family owned fifty percent of the beneficial interest. She chose not to restrict the vacant lots. Had Alice desired that the lots be kept vacant, she was aware that there were options available to accomplish that goal. Therefore, even accepting that Alice and her husband purchased the vacant lots, at least in part, to provide privacy for the summer cottages, Alice inserted no language to suggest that preserving the lots as open space was a purpose of the trust. The judge did not err in rejecting the Wansacks' argument.[16]
3. Motion to amend. The Wansacks also contend that the judge erred in *10 awarding attorney's fees to Ivo because his motion to amend the decree to award attorney's fees was served late. See Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974) ( rule 59 [e] ) ("A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment"). This conclusory assertion, in a footnote, does not rise to the level of appellate argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). See also Commonwealth v. F.W., 465 Mass. 1, 2 n.4, 986 N.E.2d 868 (2013) *155 (conclusory assertion does not rise to level of acceptable appellate argument); Commonwealth v. Lydon, 413 Mass. 309, 317-318, 597 N.E.2d 36 (1992), overruled on other grounds by Commonwealth v. Britt, 465 Mass. 87, 100, 987 N.E.2d 558 (2013) ("Arguments relegated to a footnote do not rise to the level of appellate argument"). Nonetheless, the argument is unavailing.
The date the judgment was entered in the docket, in this case December 15, 2016, not the date of the judgment, is the effective date for calculating the ten days allotted for serving a motion to amend the judgment under rule 59 (e). See Reporters' Notes to Rule 58, Mass. Ann. Laws Court Rules, Rules of Civil Procedure, at 1209-1210 (LexisNexis 2018) ("For purposes of the other rules the date of effective entry is crucial.... The specific date of the notation of the judgment by the clerk pursuant to Rule 79[a] constitutes the date of effective judgment for purposes of [ Rule 59(e) ]"). Cf. Commonwealth v. Mullen, 72 Mass. App. Ct. 136, 138, 889 N.E.2d 52 (2008) (interpreting Mass. R. A. P. 4 [b], as amended, 378 Mass. 928 [1979], and concluding that date of entry is date judgment or order is actually entered on docket). That the December 15, 2016 docket entry notes that the decree "entered" on December 13, 2016, does not change the "entry" date for purposes of calculating the ten days allowed to serve a motion to amend the judgment. Ivo served his motion on December 27, 2016. Because Monday, December 26, 2016, was a trial court legal holiday,[17] the motion was timely served. See Mass. R. Civ. P. 6 (a), 365 Mass. 747 (1974) (if last day of designated period of time is Saturday, Sunday, or legal holiday, period runs until end of next day that is not Saturday, Sunday, or legal holiday).[18]
Amended decree affirmed.

Cynthia's name is "Alice Cynthia," but she is known as "Cynthia."

There was evidence at trial that Stuart and Alice had purchased the vacant lots in the 1950s to maintain the privacy of the cottages.

Although Stuart's will expressed his desire that the cottages be used as summer homes for as long as possible, it also provided for the contingency that circumstances might arise, "for any reason which may now not be foreseen," to cause one daughter to purchase the other daughter's interest in the cottages. The will further recognized that Stuart's children and grandchildren, "by reason of the occupations and professions in which their husbands are occupied may become resident at long distances and that these circumstances may render [Stuart's] present desires with respect to these summer properties impracticable." Stuart's testamentary trust was to terminate when the youngest grandchild then living reached the age of thirty, with the remainder to be divided equally among his grandchildren.

The vacant lots passed to Alice upon Stuart's death because Stuart had acquired title to these lots jointly with Alice.

At that time Ivo was married to Alice's daughter, Cynthia.

"A 'nominee trust' is '[a]n arrangement for holding title to real property under which one or more persons or corporations, pursuant to a written declaration of trust, declare that they will hold any property that they acquire as trustees for the benefit of one or more undisclosed beneficiaries.' " Berish v. Bornstein, 437 Mass. 252, 255 n.10, 770 N.E.2d 961 (2002), quoting Black's Law Dictionary 1072, 1517 (7th ed. 1999). See generally Birnbaum & Monahan, The Nominee Trust in Massachusetts Real Estate Practice, 60 Mass. L.Q. 364 (1976).

Ivo served as Alice's estate planning attorney and drafted the MacMackin trust.

On December 30, 1994, Alice transferred two additional nearby lots to the Vineyard Open Land Foundation, a Massachusetts charitable trust.

Cynthia transferred her interest in the MacMackin trust to her sons in 2015. Cynthia's two sons each held an 18.75 percent interest and Ivo held a 12.5 percent interest. Janet, her husband, and her three children each held a ten percent interest.

Janet's purchase of the Meisners' interest in the cottages evolved through additional litigation involving Martha's Vineyard Savings Bank, the successor trustee of Stuart's testamentary trust. The details of that litigation are not essential to the analysis herein.

In his decision, the judge quoted from §§ 411 and 412 of the MUTC, and he noted that Ivo had sought termination of the MacMackin trust under those two sections as well as § 414. See G. L. c. 203E, § 411 ("Modification or termination of non-charitable irrevocable trust by consent"); G. L. c. 203E, § 412 ("Modification or termination because of unanticipated circumstances or inability to administer trust effectively"); G. L. c. 203E, § 414 ("Modification or termination of uneconomic trust").

Each "Assignment of Beneficial Interest" document accompanying the trust instrument, states, in relevant part: "I, Alice P. MacMackin, ... in consideration of blood and affection, as a gift, hereby assign and grant to [the beneficiary] ... [a] percent interest in and to the premises."

While we determine that the MUTC applies to the termination of the MacMackin trust, the parties do not contend, and we do not hold, that the MUTC applies to all nominee trusts. See note 6, supra.

The judge's use of the term "material" stemmed from his analysis of termination under both §§ 411 and 412 of the MUTC. Section 411 (b ) authorizes a court to terminate a trust where, among others, continuance of a trust "is not necessary to achieve any material purpose of the trust." Section 412 (a ) authorizes a court to terminate a trust "if, because of circumstances not anticipated by the settlor, ... termination will further the purposes of the trust." Here, where we hold that termination was warranted under § 412 (a ), the judge's use of the word "material" does not affect our analysis.

Given our decision under § 412, we need not decide whether termination was also warranted under §§ 411 and 414. We note, however, that given the lack of monetary funding of the MacMackin trust and the absence of provisions requiring the beneficiaries to maintain the properties, the judge was warranted in concluding that the trust had become uneconomical. See G. L. c. 203E, § 414 (b ) ("The court may modify or terminate a trust ... if it determines that the value of the trust property is insufficient to justify the cost of administration").

The Wansacks also argue that Ivo, as drafter and trustee of the MacMackin trust, had unclean hands, and thus the judge should not have allowed the petition to terminate the MacMackin trust. See Fidelity Mgt. & Research Co. v. Ostrander, 40 Mass. App. Ct. 195, 200, 662 N.E.2d 699 (1996). See also G. L. c. 203E, § 106 (MUTC is supplemented by general principles of equity). "[T]he question whether to deny relief on the basis of [Ivo's] conduct was a matter committed to the broad discretion of the judge."Fales v. Glass, 9 Mass. App. Ct. 570, 575, 402 N.E.2d 1100 (1980). By ordering termination and distribution of the MacMackin trust assets, the judge implicitly rejected the claim that Ivo had unclean hands warranting the denial of equitable relief. See id. We discern no abuse of discretion. Although there is animus between the parties and although Ivo may, as the Wansacks argue, benefit from the termination, he will benefit only in proportion to his designated distribution percentage, under which the Meisners receive fifty percent of the trust assets.

We take judicial notice that December 26, 2016, was a trial court legal holiday. See G. L. c. 4, § 7, Eighteenth ("Legal holiday" includes day following Christmas day when Christmas day falls on Sunday); Mass. G. Evid. § 202(a)(1) (2018) (court must take judicial notice of General Laws of the Commonwealth). See also Merchant's Discount Co. v. Simon, 289 Mass. 62, 64, 193 N.E. 561 (1935) ("That August 15, 1926, was Sunday was a fact to be noted judicially"); Mass. G. Evid., supra at § 201(b)(2) (court may judicially notice fact not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

We decline Ivo's request for appellate attorney's fees and costs pursuant to G. L. c. 215, § 45. However, we do not disturb the award of fees and costs by the trial judge.