NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-871                                          Appeals Court
18-P-872


IN THE MATTER OF THE ESTATE OF DAVID E. STACY.

DEBORAH A. STACY, personal representative,[1] & others[2] vs.  IANA
A. STACY.[3]


Nos. 18-P-871 & 18-P-872.

Barnstable.     March 1, 2019. - November 8, 2019.

Present:  Green, C.J., Neyman, & Henry, JJ.


Devise and Legacy, Intestacy, Personal property.  Husband and
     Wife, Antenuptial agreement.  Contract, Construction of
     contract, Antenuptial agreement.  Trust, Distribution.


     Petition for probate of a will filed in the Barnstable
Division of the Probate and Family Court Department on February
26, 2014.

     A petition to render an inventory and account, filed on
April 7, 2016, was heard by Robert A. Scandurra, J., on a
statement of agreed facts.

     Complaint in equity filed in the Barnstable Division of the
Probate and Family Court Department on July 23, 2015.

---

     [1] Of the estate of David E. Stacy.

     [2] Elaine Kelley and David Kelley.

     [3] Although the two cases were argued separately, because
they have overlapping facts and legal issues, we have
consolidated them for purposes of decision.

The case was heard by Robert A. Scandurra, J.

R. Alan Fryer for the plaintiffs.
Heidi A. Grinsell for the defendant.

HENRY, J.  At the heart of these cases is the proper distribution of the assets of the decedent, David E. Stacy, in light of a premarital agreement executed by him and his wife, Iana Stacy (Iana or wife),[4] and the fact that his will did not provide for his wife and expressly excluded his son from a prior marriage.  These issues have arisen in the context of two separate cases:  (1) a petition brought by the wife against the personal representative of the estate to render an inventory and account (in 18-P-871, which we shall call the inventory action), and (2) an equity action commenced by the personal representative to recover items belonging to the estate that are in the wife's possession (in 18-P-872, which we shall call the estate asset recovery action).  Because our de novo review of the premarital agreement differs from that of the Probate and Family Court judge, which in turn impacts the outcome of the decedent's estate plan, we vacate and modify portions of the judgment and decree and remand for further proceedings as necessary.

---

[4] We use the first names of those who have a common surname.

Factual background. The decedent died on February 12, 2014. He was survived by his wife of approximately six years, Iana, and his minor son from a prior marriage. He was also survived by his biological mother, Elaine Kelley (Elaine); his sister, Deborah Stacy (Deborah); and his adoptive mother, Joan Bentinck-Smith, who adopted the decedent in 1995 when he was thirty-four years old.

1. The decedent's last will and the David E. Stacy Revocable Trust of 2001. The decedent executed his last will on August 19, 2003 (decedent's will), and nominated Deborah as the executor of his will. Subsequently, she was appointed personal representative of his estate. The decedent's will bequeathed all of his property to the trustee of the David E. Stacy Revocable Trust of 2001 (2001 Trust). The decedent expressly omitted from his will his son, a former wife, and his adoptive mother, Bentinck-Smith.

As amended in 2003, the 2001 Trust named as sole beneficiary the decedent's biological mother, Elaine. The decedent also excluded from the 2001 Trust his son, former wife, and adoptive mother as beneficiaries. The 2001 Trust, as amended, appointed Deborah as trustee.

The wife is not named as a beneficiary in either the decedent's will or the 2001 Trust, which were both executed prior to their 2008 marriage.

2.  The premarital agreement.  The decedent and the wife entered into a premarital agreement on July 18, 2008.  The parties dispute the interpretation of this agreement.  However, it is undisputed that the premarital agreement enumerated the parties' separate property owned by each of them at the time of the marriage.[5]  The decedent included in his list of assets something called "Pigeon Trust."  Bentinck-Smith created the Pigeon Trust, an irrevocable life insurance trust, naming as "the beneficiaries" only one beneficiary:  David E. Stacy, the decedent.  Article VI of the Pigeon Trust, identifying the decedent as the beneficiary, did not expressly identify the decedent's estate as a beneficiary should he predecease the donor, although other provisions did identify the decedent's estate.  The decedent's list of assets in the premarital agreement described the Pigeon Trust, (a) identifying himself as the beneficiary, (b) identifying the successor beneficiary as "___," (c) stating the principal value of this asset as of July 14, 2008, and (d) noting there would be no distribution of trust

------

[5] "Separate property of a party" is defined in the premarital agreement in part as "all property owned by that party prior to the marriage in his or her name individually, in trust or otherwise, including but not limited to property owned or to become owned as a beneficiary of any trust, or in any form of ownership whatsoever with any other person (other than the other party)."

principal until the death of the donor, who was his adoptive mother, Bentinck-Smith.[6]

As already stated, Bentinck-Smith survived the decedent. The surrender value of the life insurance policy held by the Pigeon Trust as of December 5, 2016, was $1,648,879.45.

We reserve recitation of additional terms of the premarital agreement and the Pigeon Trust for discussion below.

Procedural background.  The largest asset in dispute is the Pigeon Trust.  Thus, before turning to the two lawsuits on appeal, we first address an earlier action that the personal representative filed concerning disposition of the Pigeon Trust.

1.  Litigation regarding the Pigeon Trust.  In May 2015, Deborah, as personal representative of the decedent's estate, filed a petition to terminate the Pigeon Trust early.  Later, the trustees of the Pigeon Trust (Pigeon trustees) filed a petition for instructions as to whether the rightful beneficiary of the trust was the decedent's estate or the decedent's descendant.[7]  The court consolidated these two petitions.  After

---

[6] The decedent's list of assets in the premarital agreement also included several real properties, the "2003 D.E.S. Support Trust (Irrevocable)," a $990,990 judgment, jewelry worth $186,000, a coin collection, other collections, tools and equipment, several specific bank accounts and investments, three automobiles, a boat, arts and antiques, loose gemstones, and a business, Stacy Imports, Inc.

[7] While the terms of the Pigeon Trust limited amendments to correction of scrivener's errors and prohibited amendment to the

mediation, Deborah, individually and in her dual capacities as personal representative of the decedent's estate and as trustee of the 2001 Trust; the Pigeon trustees; a guardian ad litem for Bentinck-Smith; and a guardian ad litem for the decedent's son eventually came to a "Non-Judicial Settlement Agreement" (settlement agreement). This settlement agreement essentially called for dividing the trust res in half, minus fees, and distributing one half to a trust for the son's benefit, and the other half to Deborah, as trustee of the 2001 Trust, the remainder beneficiary of the decedent's will.

The wife objected to only so much of the settlement agreement as called for distribution of Pigeon Trust principal to Deborah as trustee of the 2001 Trust, rather than to Deborah as personal representative of the decedent's estate. The judge approved the settlement agreement, reserving, with Deborah and the wife's agreement, the question whether the Pigeon Trust distribution to Deborah should be in her capacity as personal representative of the decedent's estate or in her capacity as trustee of the 2001 Trust. This question was to be resolved in the inventory action.

---

article designating a beneficiary, several amendments were executed over the next two decades changing the terms of the mandatory distribution article, including who would benefit from mandatory distribution.

2. <u>Estate asset recovery action</u>. On July 23, 2015, Deborah, in her capacity as personal representative, filed an equity complaint alleging that the wife had taken from the marital home personal property belonging either to the estate or to Elaine and her husband, David Kelley (David). The amended complaint asserted claims against the wife for constructive trust, conversion, unjust enrichment, and violation of G. L. c. 190B, § 3-709.[8] The complaint also sought a declaratory judgment interpreting the premarital agreement as it related to the wife's interest in the estate's assets and the wife's obligations to return property, as well as the wife's liability for the value of any property taken and all damages caused to the estate. The amended complaint included the decedent's mother, Elaine, and her husband, David, as plaintiffs seeking to recover their property from the wife. The wife also filed a counterclaim asserting that the personal representative committed a breach of her fiduciary duty toward the wife.

After a trial, the judge deemed the premarital agreement null and void upon the decedent's death and concluded that it "shall have no applicability relative to the estate of David E.

---

[8] General Laws c. 190B, § 3-709 (<u>b</u>), provides that "[w]ho ever injuriously intermeddles with any personal property of a deceased person, without being thereto authorized by law, shall be liable as a personal representative in his own wrong to the person aggrieved."

Stacy." Additionally, the judge found that the wife possessed certain enumerated pieces of the decedent's personal property worth $76,875 and additional property of unknown value, and credited the wife's denial that she possessed other items. Per the personal representative's request, the judge ordered that the wife return all of the decedent's property to the personal representative. However, sua sponte, the judge also ordered that if the wife did not return the property, the personal representative could deduct the value of assets in the wife's possession from the wife's share of the estate.

The judge further found that the personal representative's claims of conversion, unjust enrichment, and violation of G. L. c. 190B, § 3-709, and request for imposition of a constructive trust were based on the assertion that the premarital agreement applied in the event of death and took precedence over the otherwise applicable provisions of G. L. c. 190B, §§ 2-102, 2-301, 2-403 (a), and 2-404 (a). Given his conclusion that the premarital agreement was null and void, the judge concluded that those claims failed. Finally, the judge dismissed the wife's counterclaim, finding that the personal representative had not breached her duty toward the wife. In this matter, all parties appealed.

3. Inventory action. On April 7, 2016, the wife brought a petition to order the personal representative of the estate to

render an inventory and account. As noted above, consolidated with this petition was the issue of the capacity in which Deborah would receive the distribution of the Pigeon Trust settlement agreement proceeds: as personal representative of the decedent's estate or as trustee of the 2001 Trust.

Based on the parties' legal briefs and an agreed statement of facts, to which the Pigeon Trust and its multiple amendments were attached, the judge determined that the Pigeon Trust settlement agreement proceeds should be distributed to the decedent's estate. The judge also allowed the personal representative's account, with the judge's amendments, and concluded that the wife "as surviving spouse is entitled to the first $100,000 plus one-half of the balance of the decedent's probate estate."[9] The judge further concluded that after the wife received her share, the remainder of the estate assets would pour over into the 2001 Trust. In this matter, the wife and personal representative both appealed.

Discussion. In 2008, the Legislature overhauled the law governing the probate process by adopting nearly the entire Uniform Probate Code (code). See St. 2008, c. 521, §§ 9 and 44, as amended by St. 2011, c. 224, and made effective March 31,

---

[9] See G. L. c. 190B, § 2-102 (4) ("the first $100,000 plus 1/2 of any balance of the intestate estate, if 1 or more of the decedent's surviving descendants are not descendants of the surviving spouse").

2012; G. L. c. 190B.  As relevant here, G. L. c. 190B, § 2-301 (a), of the code provides that where a surviving spouse married the testator after the testator executed a will, as occurred here, "the surviving spouse is entitled to receive, as an intestate share, no less than the value of the share of the estate the spouse would have received if the testator had died intestate as to that portion of the testator's estate, if any, that neither is devised to a child of the testator who is born before the testator married the surviving spouse and who is not a child of the surviving spouse [nor a descendent of such child] . . . ."  This right is subject to the terms of the premarital agreement.  See generally Austin v. Austin, 445 Mass. 601, 603-604 (2005).  We begin our discussion there.

1.  The premarital agreement.  The wife argues that, as in other contexts involving waivers of statutory rights, any waiver of her statutory right of intestate succession must be clear and unmistakable.  See, e.g., Crocker v. Townsend Oil Co., 464 Mass. 1, 14 (2012) ("[an agreement] purporting to release all possible existing claims . . . will be enforceable as to the statutorily provided rights and remedies conferred by the Wage Act only if such an agreement is stated in clear and unmistakable terms"); Warfield v. Beth Israel Deaconess Med. Ctr., Inc., 454 Mass. 390, 398 (2009) (same for G. L. c. 151B rights and remedies).

We agree with the wife that no provision of the premarital agreement clearly and unmistakably waives one spouse's rights of intestacy.  That, however, does not end our inquiry.

The premarital agreement identified each party's separate property and expressly provided that after the marriage, that property was to remain the individual's property, was to be treated as if no marriage had occurred, and would not be subject to any claims arising from the marriage.  It is well settled that through a premarital agreement, future spouses may relinquish claims to assets identified by each at the time of the marriage.  See Rostanzo v. Rostanzo, 73 Mass. App. Ct. 588 (2009) (death).  See also DeMatteo v. DeMatteo, 436 Mass. 18 (2002) (divorce).

Notwithstanding the express waiver of any interest in the decedent's separate property, the wife contends that the agreement applies only in the event of divorce, and not in the event of death.  The wife points to numerous provisions in the premarital agreement that address divorce in support of her argument.[10]  "[W]e construe a contract as a whole, so as 'to give reasonable effect to each of its provisions.'"  James B. Nutter

---

[10] The premarital agreement is titled "G. L. c. 208, § 34 AGREEMENT," which pertains to divorce, but the parties agree that it was mistitled.

& Co. v. Estate of Murphy, 478 Mass. 664, 669 (2018), quoting
J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 795 (1986).

The premarital agreement contained provisions related to
divorce,[11] but the entire agreement was not expressly limited to
divorce. Numbered par. 4 contains broad language, providing
that after the marriage, the parties shall retain all right and
title to their separate properties as if the marriage had never
taken place.[12] As previously stated, the Pigeon Trust and other
assets were identified as the decedent's separate property.

There is no ambiguity as to how the parties chose to define
and treat their separate property upon the marriage.[13] As in

_____

[11] For example, numbered par. 1 provided in pertinent part:

"The parties intend at this time and by this instrument to
make a final and complete settlement of all matters
relating to the interest and obligations of each with
respect to all future property matters, including but not
limited to alimony, support, maintenance, property
assignment, and the rights of the parties under G. L.
c. 208, § 34, as amended, in the event of a divorce."

[12] Specifically, numbered par. 4 provides:

"After the marriage takes place, each of the parties shall
separately retain all rights in his or her property owned
at the time of the marriage, including appreciation
attributable to such property that may occur during the
marriage, with the same effect as if no marriage had been
consummated between them. Each party shall have the
absolute and unrestricted right to dispose of his or her
separate property, free from any claim of the other based
upon their marriage."

[13] The wife points to extrinsic evidence from the attorneys
involved in drafting the agreement to support her claim that

Pisano v. Pisano, 87 Mass. App. Ct. 403, 412-413 (2015), "[w]e start with the observation, made clear from paragraph[] [4] of the premarital agreement, that each party sought to protect from the other his or her separate property, . . . and any appreciation in value of . . . that property. That the parties were to control all aspects of their separate property . . . is . . . manifest in paragraph [4], which allows the parties to control, use, and dispose of their separate property in the same manner as if the marriage had not taken place." In Pisano, we concluded that although the agreement at issue did not contain express language waiving alimony, the foregoing provision ensured that the wife's separate property was not available to the husband for any alimony claim. Id. at 414. Similarly, here, although the premarital agreement did not contain an express waiver of the wife's intestate share of the decedent's estate, she did agree that certain identified assets would remain the decedent's separate property "free from any claim . . . based on their marriage."[14]

---

application of the premarital agreement at death was not discussed. However, the wife does not expressly argue that the agreement is ambiguous; thus, her reliance on extrinsic evidence is misplaced. See Redstone v. O'Connor, 70 Mass. App. Ct. 493, 498 n.14 (2007). We do not consider the extrinsic evidence.

[14] Numbered par. 4 is not the only provision of the premarital agreement that applies in a context other than divorce. Numbered par. 15 on page six of the agreement (there are two paragraphs labeled 15, one on page five and one on page

Even if the possibility of divorce was the guiding force behind the premarital agreement, the parties, with the advice of counsel, chose to permanently waive any interest in one another's identified property throughout the marriage and afterwards without condition "as if no marriage had been consummated between them."[15]  Moreover, the wife waived any future claim to the decedent's separate property "based upon their marriage."  Nothing in the agreement suggests that the wife's waiver terminated upon the death of her spouse.  To now claim an intestate share in those assets through the decedent's estate is in contravention of the premarital agreement.  Indeed, the wife asks us to insert language into the premarital agreement that provides that she and the decedent agreed to

_____

six) sets forth waivers of one another's qualified joint and survivor annuities, qualified preretirement survivor annuities, and all retirement plans.  The wife correctly concedes in her brief that par. 15 would apply even in the absence of divorce.

[15] By agreement, the wife did not, at any time during the marriage, gain any interest in the property identified in the premarital agreement as the husband's separate property.  That intention is further demonstrated in the provisions directed at divorce, which repeated that the spouses' separate property would remain the property of each spouse to the exclusion of the other spouse and, depending on the length of the marriage, provided for progressive monetary payments to the wife.  Any alimony obligation would terminate in any event upon the decedent's death.  In no event contemplated by the agreement would the wife obtain a title interest to the decedent's separate property.

treat their separate property as if there had been no marriage unless one of them died. This we cannot to do.

Based on the plain language of the premarital agreement, we hold that the wife waived any right to the Pigeon Trust and all of the other property identified in the premarital agreement as the decedent's separate property. In other words, the decedent's interest in the Pigeon Trust is treated upon the occasion of his death as though the parties were never married, to the effect that the wife can claim no entitlement to a share of that property from his estate through intestacy by virtue of her status as spouse. While this separate property is part of the decedent's estate, it cannot be used for purposes of calculating or receiving the wife's intestate share of the decedent's estate.

2. The Pigeon Trust settlement agreement proceeds. We look to the terms of the Pigeon Trust to determine the proper distribution of the Pigeon Trust settlement agreement proceeds. As originally drafted, the Pigeon Trust is not a model of clarity as to the distribution of trust assets in the event that the decedent predeceased the donor, Bentinck-Smith. Two things are certain, however. First, the instrument provides that under no circumstances shall the trust property revert to the donor or her estate, in essence eliminating Bentinck-Smith as the

intended contingent beneficiary.[16]  Second, when the Pigeon Trust was created, the 2001 Trust did not exist, nor did any subsequent amendment of the Pigeon Trust purport to add the 2001 Trust as a beneficiary, contingent or otherwise.  Thus, at no point was the 2001 Trust a contingent beneficiary of the Pigeon Trust.[17]

We agree with the judge that the decedent's estate was the contingent beneficiary in the event, as occurred, the decedent predeceased Bentinck-Smith.  Read together, several provisions in the original trust instrument reflect Bentinck-Smith's intent to distribute the Pigeon Trust assets to the decedent's estate in the event that the decedent predeceased her.[18]  See Redstone v. O'Connor, 70 Mass. App. Ct. 493, 499 (2007), quoting Harrison

---

[16] No party argues that the gift to the decedent lapsed and the Pigeon Trust should be distributed to the donor.  See Redstone, 70 Mass. App. Ct. at 494, 500-501.  Bentinck-Smith's guardian, in any event, disclaimed any interest in the Pigeon Trust in the settlement agreement.

[17] The personal representative also contends that the 2001 Trust is the proper beneficiary because the decedent "could have been expected to place in[to] the 2001 . . . Trust any amounts distributed to him from the Pigeon Trust so as to minimize the exposure of his estate to estate tax liability."  She cites no authority, however, for the proposition that we may speculate as to what the decedent might have done with the Pigeon Trust proceeds had he survived the donor.  The argument is unavailing.

[18] Because we rely on the original terms of the Pigeon Trust, we need not reach the personal representative's argument that the judge's conclusion is wrong because the parties had not agreed upon whether the trust amendments "were validly executed or remained in effect."

v. Marcus, 396 Mass. 424, 429 (1985) ("A trust should be construed 'to give effect to the intention of the settlor as ascertained from the language of the whole instrument considered in the light of the attendant circumstances'").

For example, under art. VIII § D of the Pigeon Trust, distribution of trust principal was mandatory after the death of the donor and

> "[i]f the Trustee shall not have distributed all of the Trust Principal during the lifetime of the said Beneficiaries, then at the death of the first Beneficiary (living at the time of the execution of this Trust and at the time of my death) to die, the Trustee shall distribute all of the Trust Principal to the Beneficiaries or their estates, in equal shares, free of all Trust, and this Trust shall terminate."[19]

Additionally, had the trust principal fallen below $50,000 after Bentinck-Smith's death and before mandatory distribution pursuant to § D, art. VIII § F permitted the trustees to terminate the trust and "distribute the Trust Principal to the Beneficiaries (or their estates, if any such Beneficiary has predeceased me), in equal shares." The trust instrument also contemplated that both the donor and David might die before the Pigeon Trust assets were fully distributed, and named David's estate as the contingent beneficiary in that eventuality.

_____

[19] We recognize that § D is problematic in that there was only one named beneficiary and yet this provision came into play only if there was a beneficiary living at the time of the donor's death. That incongruity does not detract from the donor's intent to benefit the beneficiary's estate.

Significantly, the trust instrument disavowed a reversionary interest to the donor or her estate.[20]

Accordingly, we conclude that there were sufficient indicia of the donor's intent to determine that the decedent's estate was the intended contingent beneficiary of the Pigeon Trust should the decedent predecease Bentinck-Smith. Therefore, the Pigeon Trust settlement agreement proceeds should be distributed to Deborah, as the estate's personal representative.[21,22]

3. Wife's intestate share. As a result of the adoption of the code, a will executed prior to marriage is no longer void in

---

[20] We recognize that in Redstone, 70 Mass. App. Ct. at 499-500, we noted that our courts have rejected arguments that a donor's intention to make a gift to an identified individual based upon one contingency was an adequate basis upon which to conclude that the donor would have made the same gift to the same individual where a different, unanticipated contingency came to pass. Here, however, the donor explicitly prohibited any gift from reverting to the donor.

[21] The personal representative also argues that pursuant to Bongaards v. Millen, 440 Mass. 10, 17 (2003), because the Pigeon Trust was created by a third person, the trust assets should not be considered part of the decedent's probate estate. Although Bongaards is distinguishable in several respects, for our purposes it suffices to say that Bongaards addresses a trust with a schedule of contingent beneficiaries that did not designate the decedent's estate as the contingent beneficiary. Id. at 12. Accordingly, we discern no merit in the personal representative's argument.

[22] Given our conclusion, we need not address the personal representative's argument that the judge made an erroneous finding as to whether the 2001 Trust was funded prior to the decedent's death.

this Commonwealth.[23]  Because the wife is not a beneficiary of the will, the next question is the size of the wife's intestate share.  Here, where the decedent was survived by his wife, his son (who is not a descendant of the surviving spouse), and his adoptive mother, we agree with the judge that the wife's intestate share is "the first $100,000 plus 1/2 of any balance of the intestate estate."  G. L. c. 190B, § 2-102 (4).  See G. L. c. 190B, § 2-301 (a).

The wife contends that because (1) the son and adoptive mother joined in the settlement agreement, (2) the son in essence received a distribution pursuant to that agreement, and (3) the decedent expressly omitted his son from his will, all the remaining estate should pass to the wife, notwithstanding the decedent's will.  We disagree.  There simply is nothing in the statute that suggests that the way the decedent treated his descendants in his will alters the statutory calculation of a spouse's intestate share, and nothing in the settlement agreement suggests that the parties agreed that the wife is

---

[23] Pursuant to the former G. L. c. 191, § 9, see St. 1892, c. 118, repealed by St. 2008, c. 521, § 10, marriage acted as a revocation of a will made prior to the marriage, "unless it appears from the will that it was made in contemplation thereof."  The code applies to the decedent's will.  See St. 2008, c. 521, § 43 (1) (providing, "[T]his act shall apply to pre-existing governing instruments, except that it shall not apply to governing instruments which became irrevocable prior to the effective date of this act").

entitled to all the remaining assets of the estate.[24]  Moreover, the spousal share is derived from only that portion of the testator's estate, if any, that is not devised to the testator's child.  See G. L. c. 190B, § 2-301 (a).  Thus, the statutory provisions already take into account any distribution to a child in creating the formula for the wife's intestate share.  Once the wife's intestate share is established, the remainder of the estate passes according to the will.

4.  Administration of the estate.  a.  Credibility determinations.  The personal representative argues that the judge erred in crediting the wife's testimony as to the decedent's assets allegedly in the wife's possession in light of evidence that the wife had been dishonest in other matters, particularly where, at trial, the wife had first denied having certain assets but then admitted to having them when faced with photographs or other evidence.  The Supreme Judicial Court rejected a similar argument in Buster v. George W. Moore, Inc., 438 Mass. 635, 644 (2003), concluding that "[t]he judge was free to credit and discredit portions of each party's testimony." Accordingly, we defer to the judge's credibility determinations. See G.B. v. C.A., 94 Mass. App. Ct. 389, 395 (2018).

---

[24] The wife's reliance on statutory provisions related to disclaimed shares of an estate or intestacy, other than the wife's intestate share, is unavailing.

b.  Estate assets in the wife's possession.  The judge found that the wife possesses some assets that were identified in the premarital agreement as the decedent's separate property and that the personal representative requested that the wife return such assets.  It was error to give the wife the option to keep assets and take a deduction for their value from her portion of the estate.  Under the code, it is the option of the personal representative to require the wife to return those items or to deduct those items from the wife's intestate share.  See G. L. c. 190B, § 3-709 (a) (upon request "every personal representative has a right to, and shall take possession or control of, the decedent's property").

c.  Conversion, unjust enrichment, and G. L. c. 190B, § 3-709.  The judge found that the personal representative's claims of conversion, unjust enrichment, and violation of G. L. c. 190B, § 3-709, against the wife failed because the premarital agreement does not apply at death.  Given our holding to the contrary, those claims must be reinstated.[25]

---

[25] The wife argues that the judge failed to make allowances for joint assets other than an Avalanche automobile.  She adopted the judge's recitation of the facts, however, and has not identified joint assets to which she claims she is entitled. In addition, although she claims that she has the right under G. L. c. 190B, § 2-403, to select property of the estate up to $10,000, the wife has not cited anywhere in the record indicating that she purported to do so.  Nor do her requests for findings and rulings suggest she raised this issue below.  As a result, we do not reach these arguments.  To the extent the

d.  Estate assets in Elaine's possession.  According to the agreed statement of facts, the State Police removed the decedent's guns from his home and brought them to Elaine and David Kelley's home.  Elaine testified that because she holds an appropriate license, she took possession of the decedent's gun collection for the benefit of the estate.  So far as the record reveals, the personal representative had not asked her to return the collection.  See G. L. c. 190B, § 3-709 (a) (personal representative may leave decedent's property with "the person presumptively entitled thereto unless or until, in the judgment of the personal representative, possession of the property will be necessary for purposes of administration").  Although not requested by the parties, the judge nonetheless ordered Elaine to return the gun collection or the value of the collection to the personal representative "forthwith," providing, in the alternative, that if this were not done, the value of the collection would be deducted from Elaine's eventual share of the decedent's estate.[26]  While we agree that, upon request, Elaine

---

personal representative pursues the claims that have been reinstated, however, nothing we have said should preclude the wife from raising these issues in defense.

[26] We note that in the event a personal representative is also an heir or legatee, G. L. c. 140, § 129C (n), permits a firearm to be transferred from the decedent to said heir or legatee even if they do not possess the requisite license, so long as they obtain said license within 180 days of the transfer.  Here, the record indicates that the personal

must transfer the gun collection to the personal representative, so much of the judgment as compels Elaine to return the collection now is premature.  See G. L. c. 190B, § 3-709 (a).

e.  The Kelleys' property.  The Kelleys claimed and testified that the wife took items they owned but were in the decedent's home when he died.[27]  The judge found that "[w]ith the exception of the testimony provided by Mr. and Mrs. Kelley, no other evidence was presented with respect to these items."  It is unclear whether the judge declined to credit the Kelleys' testimony or erroneously concluded that the Kelleys had to produce corroborating evidence to sustain their claim.  A witness's testimony alone, without corroboration, may meet a party's burden of proof.  See generally Cooper v. Keto, 83 Mass. App. Ct. 798, 808 (2013) ("the mother's testimony alone properly supported [the judge's] findings").

In addition, the judge made no credibility determinations or findings concerning a cognac diamond pendant that Elaine testified she loaned to the wife for a photograph for a newspaper story; the wife admitted that she possessed the

---

representative does not have an appropriate license but is silent as to whether she has applied to obtain one.  See G. L. c. 269, § 10 (h) (1) (it is illegal to own, possess, or transfer a firearm without the requisite license).

[27] The items include three pieces of artwork, a rototiller, a chainsaw, and a generator.

pendant but claimed that Elaine and the decedent had given it to her as a gift. We conclude that the matter must be remanded for further findings on these issues in the estate asset recovery action.

5. The wife's counterclaim. Finally, the judge rejected the wife's claim that the personal representative committed a breach of her duties toward the wife and should be removed as unsuitable and hostile to the wife. The personal representative's position that the wife was not entitled to escrowed Pigeon Trust settlement agreement proceeds, albeit for different reasons, was correct. We discern no basis, therefore, for the wife's claims and thus no error in the judge's decision to dismiss the wife's counterclaim.

Conclusion. 1. Docket no. 18-P-872 -- estate asset recovery action. So much of par. 1 of the judgment as declares the premarital agreement null and void is vacated, and the paragraph shall be modified to declare that the assets identified in the premarital agreement as the separate property of the decedent cannot be used for purposes of calculating the wife's intestate share of the decedent's estate. The judgment shall be further modified to declare that said separate property passes in accordance with the decedent's will.

Paragraph 2 of the judgment shall be modified by deleting the second sentence and substituting therefor a declaration

that, unless the personal representative agrees to allow the wife to retain the property described therein and credit the value toward the wife's intestate share of the decedent's estate, the wife shall return the property to the personal representative within thirty days of issuance of the rescript of this decision.  The second sentence of par. 2 of the judgment shall be further modified by adding a declaration that Elaine Kelley must return the estate property in her possession described therein, including, without limitation, the guns and gun accessories (gun collection) to the personal representative within thirty days of any written request by the personal representative that she do so; that, absent such a request, Elaine may continue to store estate property, including, without limitation, the gun collection, provided that Elaine still holds a valid firearms license; that, if the personal representative takes physical possession of the gun collection, she shall store the firearms with a licensed holder or first obtain the appropriate license(s); and that, in her inventory, the personal representative must also account for the estate's personal property in any third party's possession.

The second sentence of par. 3 of the judgment shall be modified to declare that the wife shall return the property described therein to the personal representative within thirty days of issuance of the rescript of this decision.

So much of par. 4 of the judgment as dismisses the personal representative's claims for conversion, unjust enrichment, violation of G. L. c. 190B, § 3-709, and imposition of a constructive trust is vacated, and those claims are reinstated.

As so modified, the judgment is affirmed, and the matter is remanded for further proceedings consistent with this opinion, including for further findings on the Kelleys' claims.

2. Docket no. 18-P-871 -- inventory action. Paragraph I of the decree shall be modified to add a declaration that the Pigeon Trust settlement agreement proceeds cannot be used for purposes of calculating the wife's intestate share of the estate of David E. Stacy.

The first sentence of par. V of the decree shall be modified by striking the phrase "which includes the Pigeon Trust settlement proceeds" and substituting therefor:  "excluding the Pigeon Trust settlement agreement proceeds and any other separate property of the decedent identified in the premarital agreement executed by David E. Stacy and Iana Stacy dated July 18, 2008."

As so modified, the decree is affirmed.

So ordered.[28]

---

[28] All parties' requests for attorney's fees are denied.